Case No. 18-5264, Baystate Franklin Medical Center, et al., Appellants v. Alex Michael Azar, II, as Secretary of the Department of Health and Human Services. Ms. Wertheimer, for the Appellants. Mr. Himobon, for the Appellants. Mr. Himobon, for the Appellants. Good morning. May it please the Court, Rachel Wertheimer, for the Appellants. The question before the Court is whether the Secretary can reasonably rely on facially inaccurate data that causes hospitals in a single state to lose approximately $110 million of Medicare revenue to which they are otherwise entitled. Here, the Secretary was alerted to erroneous data, first by Nantucket Community Hospital, and then by numerous other hospitals who, by virtue of the application of the rural floor, were affected by Nantucket's error. The Secretary chose to ignore the error, citing a technical breach... He didn't ignore it. I'm sorry? He didn't ignore it. He did not correct the error. Okay, that's two different things. If he had ignored it, you might have a better case. Well, we submit, Your Honor, that while he recognized that an error may have been made, the reasons that were given for his refusal to correct the error were insufficient. Right, and if he had given no reasons, that would have been ignoring it. But you don't represent it accurately when you say he ignored it. He gave reasons that you don't like. He gave reasons... It was a deadline, right? Nantucket... And the Secretary imposed the deadline, or the representatives down the line followed the deadline, right? As to Nantucket, correct, Your Honor, but as to my clients and as to the numerous other hospitals in Massachusetts who suffered the result of Nantucket's error, there was no deadline. We are appealing the... Well, there was a deadline as to when the computations were made, right? There was a deadline as to when hospitals can challenge what they believe to be errors... When the computations become final, right. Computations is what we're dealing with here. Correct. And the deadline says as of X date, and the Secretary of People imposed it as of that date, right? There was a proposed calculation that was published in April of 2017-16. And my client submitted comments to that proposed calculation that the Secretary had full discretion to correct before publication of the final rule, which was not until August of 2016. So the comments that my client and the corrections that my client requested were actually made to a proposed calculation, not to the final calculation. And I want to bring us back to what the Secretary's obligation is in this case, which is to adjust the wage-related cost portion of hospitals' costs by a factor that reflects the relative hospital's wage level in the geographic area as compared to the national average. Sure, but the Secretary can also devise a process for making that determination. And we've said the Secretary gets deference in structuring that process, which necessarily includes deadlines for hospital data. Absolutely. We can see that the Secretary has discretion as to how to calculate that, the wage... And to impose deadlines. And to impose... So here there's a deadline. Nantucket missed it. Correct. Your clients come in and they say, gosh, this is unfair to us. We didn't miss the deadline. And the Secretary's response is the deadline's established by legislative rule. It's important to the fairness and integrity of our program. And we have a pattern of not excusing it. Seems like a perfectly plausible reason for not excusing it. Well, we submit that those justifications are not perfectly plausible. And at the end of the day, while the Secretary certainly has discretion as to how to calculate and to come up with a process for calculating the wage index, that doesn't permit the Secretary to simply ignore accuracy full stop, which is, I think, what the appellees are essentially arguing here. Isn't there a lot of case law in the circuit that has talked about the Secretary's ability to balance accuracy and finality? It's a big job here. It's not just computing one hospital, because one hospital affects every hospital in the country under the budget and tally principles. So it's really the best accuracy within a workable time frame. We have cases that recognize that. You're absolutely correct, Your Honor. And again, our position here is that this kind of error, which is extremely rare and extremely significant, even by the Secretary's own standards. So what we're talking about here with respect to the wage index was a 7% drop in the wage index for Nantucket and therefore for those imputed floor hospitals. Data in the record published by the Secretary in FY 2017 shows that 1% of hospitals nationwide saw anything close to this kind of drop in the wage level. So to correct this kind of significant error, we submit, would not have been a significant burden on the Secretary. Do you have any case or any instance in which, in a situation either exactly like this or at least somewhat like this, HHS has chosen to excuse a deadline? Well, Your Honor, Methodist, the Methodist case, which was relied on heavily by the court below, that was a wage index case. And in that case, it had to do with the Sacramento statistical area. Three hospitals, not the reporting hospital, noticed a significant error in the wage index that was caused by an error by a fourth hospital. And the Secretary actually did. He instituted a midyear correction, which is, in many instances, rarer. Changed it going forward, but not as to the previous months in that year. But in the middle of the year, which is a significant administrative undertaking, he adopted that corrected data to correct the wage index. So, in fact, I think that is an example of the Secretary doing, even later in the process, what we were asking him to do while the rule had yet to become final. And then there's other instances in the record, in this case, in the final rule, that reflect that the Secretary made other changes to the wage index that were certainly discretionary. Did he make the changes at this point in the timeline that you're talking about? Correct. So, under the Secretary's rules, the only errors that hospitals may, you know, directly sort of appeal as of the proposed index, as after publication of the proposed wage index in the proposed rule, are errors that are due to either CMS miscalculations. I'm not hearing an answer to the question that I asked. I'm sorry? You said there were many instances in which they made changes. My question was, were those instances involving changes at this point in the timeline? Yes, they were. Can you give us an example of that? So, one change, if at 1266 of the record, which is 81 Federal Register 56915, the Secretary had excluded from the proposed rule data from certain hospitals, because, according to the Secretary, that data was aberrant and shouldn't be included in the final wage index. But between the publication of the proposed rule in April and the final rule in August, which is the exact timeline at issue for my client's comments, he apparently received corrected data and then included that data in the final wage index. Was that corrected data from a hospital that had just misreported and not double-checked its numbers like Warren, or was it something that a contractor or CMS itself had discovered? It's a little bit unclear from the record. It does not appear to have been a MAC or CMS error. It was error in the data that had been reported by the hospital that the Secretary concluded was aberrant. I'm sorry. So it was something that was from the very get-go submitted by the hospital in the record? It appears that way from what's in the final rule. Yes, Your Honor. And if you may, I'm going to reserve just one minute. Can I just — sorry. I'm just skimming Methodist. Yes. I remember the holding, but not the — Yes. of it, and maybe I'm missing something, but I don't see that the Court engaged at all on, you know, the existence of an antecedent deadline and HHS's desire to enforce it. It's just a straight-out retroactivity case. The issue comes up, they think it's preserved, and they say, we'll give prospective effect, but not retroactive effect. The Court did not engage it. I was simply pointing out that the facts of that case — You're using it just as any — I asked you for an example, and you're using it for that. Exactly. It shows that the Secretary, in fact, did make a correction based upon an error by a third party. But so far as we can tell, on the face of the opinion, not in the face of a prior-blown deadline. Right. Well, clearly, the hospital hadn't submitted the correct data by the deadline, or it would have been included in the final rule. It wasn't included in the final rule. It was only after these other hospitals pointed it out, the Secretary then used his discretion to amend the final rule, actually, mid-year, to address that incorrect data. Thank you. May it please the Court, Edward Himmelfarb of the Department of Justice, representing the Secretary of HHS. The deadlines in this process are extremely important because the process for computing the wage index is so complicated. It takes so long and uses so much interaction back and forth between the hospitals and the Medicare contractors and CMS. There are basically — if you look at the timetable, it's pages 49 to 53 of the Joint Appendix. You can divide it basically into four different stages. And the first stage is really what we're talking about here. The first stage is that for fiscal year 2017, CMS issued, published a spreadsheet with tentative raw data on hospital costs. And the deadline in the timetable was September 2nd for hospitals to correct any errors in that data. That's the first stage. The second stage is that after — is that the contractors then do a desk review. They submit it to CMS. CMS, in January of 2016, publishes a revised spreadsheet. And the hospitals are allowed to challenge things at that point, but they're not allowed to correct costs that were mistaken, that they should have corrected by September 2nd. There's a third stage between January and April, and then April the final level is published. And there's a very limited right of the hospitals to challenge anything at that point. Those are really important. What is your answer to this example? I beg your pardon? What is your answer to the example she just gave of corrections that sound like similar errors that were made? I'm not sure about that specific example. I'd have to look at it more closely. But as a general matter, if you look at, for example, if you look at the letter that Partners Healthcare sent on April 4th, 2016, to the secretary to challenge this cost error that it made, that it failed to correct this supposedly mistake. By the way, just as an aside, these are not clearly erroneous costs. They're not definitely erroneous. The costs have to go through a process. That's why you have this multistage process. Go back to where you were before you went with the by the way. Okay. If you look at the letter, there were challenges to numerous things, not just this one item. There were challenges to other things having to do with housing costs and several related aspects of that. Those were challenges to the more recent revision of the spreadsheet. So those were on time. And, in fact, if you look at the response to that letter, CMS, the secretary, agreed to make those changes. The problem was there's one aspect of it that had been the alleged inaccurate costs that were in the May 2015 spreadsheet, and those had to have been corrected by September 2nd, 2015. It was now seven months after that, and the secretary reasonably decided that it was not appropriate to make that correction. So let me ask you about that. I mean, if we focus on the relationship between Nantucket Hospital and HHS with regard to Nantucket's input data, there's a deadline. They missed it. It looks like that aspect of this larger process is fine. But, on the other hand, all of those decisions are just inputs to what ultimately becomes a proposed rule, which has to go through notice and comment rulemaking. And, as a matter of APA law, the secretary is legally obligated to keep an open mind at that point, take comments, assess them, respond in good faith to comments. So why is it that you get to effectively pretermit any deliberation, consideration of comments, et cetera, with respect to that component of what is, at the relevant time, only a proposed rule? Well, I think the secretary did respond to the comments. I don't think that's a dispute. There was a response to these particular comments that were submitted by hospitals and associations in Massachusetts and outside of Massachusetts. The secretary, in our view, made a totally reasonable decision what to accept and what not to accept, and that's part of the rulemaking process. There's no question about that. The question is whether a hospital that has missed a deadline seven months earlier then can take advantage of the fact that there's a proposed rule and then comment and say, oh, you know, I may have missed the deadline seven months ago, but you should take it into account anyway. And part of the problem with this, as I've started to say, is that... proposing a rule with a lot of inputs that were generated not by other hospitals but by HHS itself. And it said internally, this is a really complicated calculation. We're going to give ourselves an internal deadline of X, and we're going to stick to it. And X is before they propose the rule. They put the rule out for comments. People say this input is crazy, and they say, too bad, we're not going to consider it. We have a deadline. That was their own internal deadline. I'm not sure why that... I'd like to see how that would prevent an external deadline on regulated parties to provide information to HHS. I mean, I'm testing the limits of... where they have deadlines to kick in before the rule is put out for comment. These are deadlines that apply to the regulated parties, and the regulated parties are the ones who would be commenting in response to the proposed rule. Yeah, but the deadline applied to Nantucket Hospital. That's correct. There was no deadline on these other hospitals commenting, and so one would think that the natural form for them to comment would have been when a notice of the proposed rule is out and comments are invited. Let's just say hypothetically that third-party hospitals were permitted to... Here's what happens. Let's make the case simpler. Remove the rural floor statute. You still have metropolitan statistical areas. Every hospital in the metropolitan statistical area is connected with each other in the sense that ultimately they're all going to get the same wage index. So every hospital there cares about every other hospital's submitted costs. Now let's suppose you have an area which has 10 hospitals. Hospital had to correct this by September 2nd. Seven months later, it's, oh, forgot to correct this. This is really wrong. So what does Hospital 6 do? It calls up Hospital 2 and says, you're a third-party hospital. I guess I don't see how that's an answer because I think the premise is still the same. There was no deadline on those other hospitals that they had to have their comments on data in by that seven-month earlier deadline. And, in fact, there's no evidence in this record of the bad faith you're suggesting. And so they wouldn't have known. And I thought the whole point of notice and comment rulemaking is that you take the comments, you notice them, and you address them. So it doesn't seem to me your argument about the regulated party's deadline is quite addressing the issue here. But what would happen if, hypothetically, the secretary said, okay, we're going to consider these? What happens? Is that the explanation that was given in this comment, that we're worried about this sort of slippery soap, everyone's going to just launder their own errors? What was actually at stake in the comments? At the time the proposed rule was issued, the Nantucket College Hospital had asked HHS to correct the data. That was all. So when the comments came in, that was the proposal on the table. The proposal was let Nantucket correct the data. But what if the comment was from an Alabama hospital that said it wasn't that Nantucket came up short in its data. They somehow thought that, I'll just say Hospital X, in another state, had way overstated its costs, that they were not accurate. And the end result is that the hospital in Alabama, due to the budget neutrality, is going to get way less money than it should. So there's no question of cover me here, can you object because I didn't get my data in on time. They are actually hurt by the data that is submitted by Hospital X that's overinflated, because then they get less money. But they don't know about this problem until the notice and comment rulemaker comes out. Can they object to that point? They can object to it, but the issue is should the secretary grant Nantucket's request to have this adjustment made. No, it will be an evaluation of whether the secretary was arbitrary and capricious or offered reason and explanation for not addressing the concern raised by the hospital in Alabama, or all the hospitals in Alabama that are now going to come up short because of overinflated numbers in another state. Well, I think actually the response does cover the other out-of-state hospitals. It talks generally about fairness to other hospitals. No, I'm trying to ask a very mechanical question here, and that is, here the request to adjust the data to make it more accurate was from people who were going to benefit. Who were going to benefit. Right. In the exact same time frame, you instead get a comment or a lot of comments that come in and say, wait, you've got to fix that data. It's not accurate. It's going to hurt us. We're going to lose a ton of money. Is the position exactly the same? That the secretary would go, it's a deadline. We have deadlines. We don't really, we trust the hospital provider to report. We don't want, this is not the time. We cannot fix these numbers now. That is, and it's precisely because the process is so complicated and it's too difficult to allow people to allow other hospitals to come in and challenge data at the last minute, which has never been vetted. But they say that it happened. So that's the answer, that we just can't possibly do it, which isn't spelled out so well in the federal register here. But they say it's happened. It happened. As I said at the beginning, I don't have a response to that because I don't know exactly what co-counsel did. So it turned out it has happened in other cases. Then is the secretary's explanation here sufficient? I still think as a general principle, yes, because if you. I don't want to say general. In this case, if in fact, it's one thing if the secretary says, look, this is a complicated scheme. This is as complicated as math gets. I have to have deadlines to make this workable. And so I cannot break from those deadlines. That's a perfectly reasonable explanation. If the secretary doesn't break from those deadlines, if the secretary does selectively, then I need to know why. That explanation is actually in the final rule. That's the response. I know, but. I've told you that repeatedly. Now, I don't know. Again, I can't stand here and tell you about that example we're talking about. I don't know. What about the background facts of Methodist Hospital? Oh, no, that was different. What happened in Methodist Hospital is that the hospital, non-party to the case, gave some data to the state agency, and eventually it trickled its way back to somehow having an effect on the rates at that point. And what they. They gave mistaken data when you were. I don't think it was. I don't think it was a question of the deadline at that point. The question was whether the amendment could be made prospectively or retrospectively. I know, but the fact is you made it. You made a change prospectively, right, midway through the year. Right. And so this we can't change the numbers is too hard thing, doesn't it? Well, but it didn't make it retroactive, because that would have been much harder to do, make it retroactive. I believe there's a discussion in the case. It's been a little while, but I think there's a discussion in the case about why you can't do it retroactively or why it's reasonable not to do it retroactively. Sorry, just one thing. In that case, it submitted incorrect estimates. So it was the hospital that submitted incorrect data and Methodist Hospital. That's right. It was third-party hospitals that found it. That's correct. Here we're talking about a 2016 rulemaking to establish the metric for an FY 2017 payment. So it seems prospective. What your friend on the other side is asking for seems prospective in the same way that the adjustment in Methodist was prospective. Except it was even earlier. Theoretically possible to do that. There's no question it's theoretically possible to do that. We have computers. They can probably figure out how to change the data. My question isn't one of the theories. Part of your explanation was rules are important. This is complicated. We just don't make exceptions. That's right. And this seems like a somewhat analogous case where you did something that looks like a somewhat analogous exception. That's 25 years earlier. I really can't speak to the process of 25 years earlier. That was a 1994 decision, I believe. Can I ask you how hard is it? At first glance, it sounds like this would be nightmarishly hard to deal with because there are lots of claimed errors. It's unrealistic to consider rural wage index adjustments in Massachusetts in isolation from everything else that HHS has to deal with. And on top of that, every adjustment you have to make even to that one index is going to have complications for every other hospital in the country. I get that. But could it be less complicated than it sounds insofar as maybe all of these numbers are just sitting in a computer somewhere which can just spit out the relevant addition and division? And, you know, a thousand hospitals and you change the input for Nantucket and push a button and the computer just makes all the adjustments for you. I think theoretically you might be able to do that, but I think that's not the way it actually works in practice. My understanding is that they have to do modeling of payments. I'm not even sure how to explain this, but modeling of payments under one scenario and modeling of payments under another. And as a result of that, they come up with some factor. I'm sort of using the word factor because that's a statutory term. But another number that's used to adjust everybody. It's a difficult process. I mean, I guess, you know, we have computed. If at this same stage, if it turned out that Nantucket had provided the correct data to the contractor and the contractor. They messed up. Sorry. There's some glitch in the computer. Yeah. Subtracted a decimal point or a zero or something every time. And they didn't realize it until this stage. Yes. The contractor didn't realize it. And, of course, Nantucket didn't realize it until it shows up. Nobody realizes it until this printout comes and they go, wait, what happened? That's not what we gave you. It sounds to me like the changes identified by the contractor can be made at this point. That's part of the process. So it is actually workable to make this very correction at this point in time. It's just a question of whether whose mistake it was. At this point, yes. That's whose mistake it was. That's correct. Okay. So then, again, that's a different answer than it's unworkable at this time. Well, what's unworkable, Your Honor, is to allow people to come in and to correct something that should have been corrected at an earlier stage. Because the data goes through multiple changes. That's the whole idea. The petitioners here did not make the mistaken entry. It's a third party. That's correct. That's correct. It was not their error. So why isn't it arbitrary and capricious to deny them the opportunity, if it's feasible to do this mathematically, why is it not arbitrary and capricious to deny them the opportunity to correct it? Well, because you have to – there are two answers, I think. One is that, as a general matter, you need to have deadlines. And the second – We understand that. Yeah. And the second answer is that if you – Whoa, whoa, whoa, whoa. Oh, sorry. You seem to have a habit of talking over me. I'm sorry. I wish you'd watch this. According to what you told Judge Millett, it is feasible, if the mistake had come from the contractor, that you could have made these corrections. Why is it any less feasible to do it if the complaint – if the mistake was made by one of the hospitals affecting all the others? Because there are two different kinds of data we're talking about. We're talking about the ones that it's feasible to do are the ones that have already gone through the process that have been worked on by the Medicare contractors, looked at by CMS, gone back to the hospitals, back and forth and back and forth. Those are the ones it's okay to correct those. The other one, the one that's in dispute in this case, never has been seen – this proposed correction has never been seen by a Medicare contractor because it was never brought before them. And there's this whole process of back and forth of correction and double correction and triple correction has never gone through that. And you can't just take some uncorrected data in the spring when you're at the end of the cycle and you can't just take that and use it as if it's obviously – I may have misunderstood the hypothetical, but I thought the hypothetical pose was that if the same mistake had been made by a contractor rather than by the hospital itself. Yeah, I thought you said it would have been possible to make – Right, but again, that's correct, Your Honor. Presumably, the contractor error would also have followed the process. I beg your pardon? Would you still have to go through this back and forth process if the contractor said, oops? No, if the contractor has looked at the data and has gone through the process and has gone back and forth through the different stages of this process that takes about a year, the timetable allows the hospital to seek correction of that because it was a mistake made by the contractor. But our data in this case has never been even seen by a contractor. It's never been presented to a contractor because according to them, according to Nantucket College Hospital – Presumably, the corrected data in the hypothetical also would not have gone through the process of back and forth. Well, I thought the hypothetical was that somehow the contractor made a mistake – Yeah, they didn't discover the mistake until –  Until the same day the NPRM goes out, they discover the computer error. Right. The computer screwed up the numbers. So now do we have to start this back and forth on the numbers all over again? No, because that's permitted under the timetable to challenge a mistake that's made by a Medicare contractor at that stage. That's permissible. If the question is, is it feasible? Yeah, it's feasible to do that. It's theoretically feasible. It's theoretically feasible to just plug in some more data, but that's not the way the process is supposed to work, and it's not going to give you a more accurate answer to average hourly wages in Nantucket or to the wage index. And I understand your point about the concern, at least generally, being that whenever the submitting hospital's data's error, if changed, would benefit everybody else in the state. There's going to be a concern about just end-running the deadlines. Yes, yes, that's exactly the problem. But I still don't understand what you do when the person who's objecting to the data is an out-of-state hospital who's going to be hurt, and they don't know – they have no way of knowing, I don't think, about a problem with the data until the NPRM comes out, and you don't have that concern about end-running deadlines because they are adverse in their interest to the misreporting hospital. I'm hypothesizing not under-reporting, but over-claiming by the reporting hospital. What happens then? Well, I'm not sure that there's any difference there, and, you know, I can't say this is a 100 percent perfect system. You know, you have to deal with reasonableness here. As the Court said in Anna Jake's case a few years ago, the statute provides some very specific directions, but it leaves the vast majority of this process to the Secretary's reasonable discretion. And there are certain things you can do, there are certain things you can't do, and there are certain things that it's reasonable to choose one or the other. And from the perspective of the Court, the question is, is it reasonable to do that? I think that's what we're pressing. Is it reasonable to say that this notice and comment thing is really not the time for people who did not have any prior deadline to comment about something that's harming their interests? And if the answer is deadlines is deadlines, can't do it otherwise, that's one thing. But if, in fact, deadlines aren't deadlines, and we could do it sometimes, but with others, and maybe we do it sometimes, then it seems less reasonable. Yeah. At the same time, you know, it's hard to set up a principle in which you say that here's the rule, anybody's allowed to do this, but we can't allow the buddy system that I was describing earlier where the hospital with an interest in it makes a mistake, talks to another hospital that has an interest in it. Is that the reason it was given in the Federal Register here? I didn't see that. No, that's not in the Federal Register. And the reason it's not in the Federal Register is that nobody proposed in the comments. The comments don't say third parties should have the opportunity to have an independent challenge to this data. What they say is you, the secretary, should use your discretion to allow Nantucket to change its data. Nantucket's request was still pending. They do focus, the comments do focus on the distinct equities of the third party. Oh, absolutely. There's no question about that. And they couldn't have commented earlier. I'm sorry? They couldn't have commented. They didn't have a deadline earlier? No, but I'm talking about the comments to the proposed rule. Right. The comments to the proposed rule, what they say is that the secretary should accept Nantucket's request to have its data corrected. You can do some page numbers if you'd like. 71, 74, 76, 77, 78, 80, 82. I'm sorry, what are you citing here? Oh, I'm sorry, slow down. Here the patient is where the comments are made that this is what they want. They want Nantucket's request to be granted. The comments don't actually say you should have an independent right. That was brought up in district court instead. So I wrote down 13 numbers here from the appendix where commenters The appendix, okay, that's what I can, if that was the appendix. Do you want me to do it slowly? Sure. And if you could. All right. Sorry, I thought you had them. You can just tell me the page numbers again. 71 is. Okay, 71 is from the Mount Auburn Hospital. It says. Okay, so you're referring to their letters. Got it. Right. Okay. We understand from attorneys working with Massachusetts Hospital Association that CMS has the discretion to correct the wage data for Nantucket Hospital to be used. Okay. So the next one is. But this was not an error made by Mount Auburn Hospital. Right, it's not. It will reduce our Medicare payments by $4.2 million if it's not corrected. That's right. Oh, there's no question they raised the issue that it was going to hurt them. All right, so they didn't just say we're not here working for Nantucket Hospital. No, no, of course not, Your Honor. But the reason they commented was that it was going to hurt them. And what they said was that Nantucket has a pending request to have the data corrected and applied to it, and you should grant that. Because they know that if it's granted and it's corrected to Nantucket, it's going to affect them also. So if they had said in their letters, we'll throw Nantucket under the bus, it's their problem, but make the correction for all the other hospitals in Massachusetts, what then? I'm sorry. So if they had said, and I think this is a position, we don't care if you can correct Nantucket Hospital's numbers, they're on their own. They hurt themselves. They shot themselves in the foot. Right. But don't wound all of us. Right. So fix the wage index for everybody else who was innocently affected by their error. Does that make a difference in your mind? No, it doesn't make a difference. But the point is that that's conceivable in a case involving the rural floor. It doesn't work in a case that doesn't involve the rural floor, because everybody in the metropolitan statistical area has to get the same wage index. You can't punish one who came in late. Okay, but this is a rural floor. I'm looking at the Secretary's summary of the comments. And the Secretary says one comment made is that it would be good, sound public policy, to use the most accurate available data in order to prevent one hospital's data errors from having a negative effect on Medicare payments on other hospitals. So it sounds like the Secretary understands the commenters who have made the line of argument that Judge Millett was just talking about. Well, maybe I'm not being clear here. In other words, they did argue that there's more to this than they're just saying, help out Nantucket even though Nantucket messed up. They said, don't let Nantucket's mistake hurt us. Absolutely. I didn't mean to suggest that that wasn't part of the comment. It's definitely part of the comment. And the response to that is deadlines are deadlines. And I guess the question for us, I mean, I think it's a close question for whatever that's worth, is whether we read into that all of the nuance that you would have us read into it about this is just too hard and there might be subterfuge if we allow third parties to reopen. Right. And the data still has to go through the process. Right. So that the Medicare contractor's job is to decide whether this data is accurate, whether it should be permitted to be included in average hourly wages or not. That process has to go forward. And if you have data that should have been corrected in September, by the time April rolls around, it really is going to be very hard to make sure that that data is correct. Okay. Thank you very much. Do we have any time left? We'll give you two minutes if you'd like. Do you have evidence that the Secretary has been making the kind of exception that you want for a hospital's error under the modern system? I don't have. There's certainly nothing in the record to indicate that the Secretary makes, you know, this particular kind of wage index correction on a regular basis. No, at all. At all? I don't want regular basis. I mean, in terms of, well, I mean, so, I mean, if you, the Secretary makes significant number of changes to the wage index between when the proposed rule. No, I get that. But they define, these are things that, those are, all right, here are new errors that you've identified based on what we have sent out to you. And, of course, that's what should be commented on at that point. But what I'm asking you, is there evidence that at the time of the, you know, once the NPRM is out, or even a later date, like it was much later in Methodist Hospital, they said, oh, you can now, we will now make changes based on an error that was made at the hospital's original submission point that the hospital could have plenty of opportunity to correct and didn't. Has that ever happened? So other than in Methodist Hospital where it clearly did happen. That was a different, was that the prospective payment system even back then? Yes, it was. You said it was 1994. It was older. I mean, part of this is, this points to the rarity of the circumstance, of this situation, and why this was so aberrant, and why in this one instance. Well, maybe it's rare because they really have set deadlines or deadlines. Well, no, I mean, it's rare, the significant impact that this one hospital had on the entire state, and the ability of other hospitals to recognize the significant error. Generally. What they say, and it doesn't strike me as an unreasonable thing to say, is that if this door is open, no reporting hospital is going to have to be that careful, because if they find an error later, they're going to pick up the phone, call their friends, and say, can you complain about this, please? Well, I mean, I do think that the Secretary has, you know, we concede that this, the wage index is not an exercise in, you know, scientific exactitude. I think that was the end of Jake's language. But we do think there is a line somewhere that the Secretary must reasonably draw when he's weighing accuracy, which the statute does require, against administrative burden and the like. And so it is possible that if we're talking about a 0.2% change in the wage index, that that is a fair line to draw. But here, where we're talking about $110 million to a state, our position is that that is not a reasonable, that it is not reasonable to sacrifice that degree of accuracy, which is required by the statute, in favor of the administrative burden of undertaking this one change. So to be clear, then, your position is not that you're treated differently than other people where changes have been made. Your position is this is just too big of an error. Our position is that the Secretary has discretion and does make changes. And I'm not talking about this, necessarily, this particular kind of change, but does make changes to data that are the result of hospital error after the proposed rule is issued. And so he has that discretion. He does it. And we believe that that is... When you say as a result of, other than Methodist Hospital, as a result of hospital error, do you mean something that the hospital should have known about when they first reported, should have caught in the four or five months of back and forth? Or are you talking about something that was exposed by... When the Secretary put everything together and the NPRM comes out, wait a minute, wait a minute. Well, I mean, I'm not sure in terms of should the hospital have known or not known, but it was the hospital's data. It was their error in their own accounting system or whatever. It wasn't a CMS error, so... And your evidence that that has happened sometime since the 1990s is what... So I believe that that site that I pointed you to earlier, 1266, that that was an instance of... Sorry, that's JA1266? No, no, I'm sorry. It's RO. It's the record. It did not make its way into the Joint Appendix. Record 1266. Is that in the Joint Appendix? That's the one you've got? Yeah, and so in that instance, my understanding is that was data that the Secretary determined was... Data reported by hospitals that the Secretary determined was unreliable and therefore not going to be included within the wage index. The errors were addressed. He got new data, and he included it in the wage index. So my point is that the Secretary has the discretion to do this, has to weigh his statutory obligation against legitimate considerations, and in this instance we don't believe that the reasons that were given in response to the comments were reasonable or reflect that he actually considered the issues fairly. Thank you very much. Thank you, Your Honors. Case is submitted.
judges: Millett, Katsas, Sentelle